

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 4:14-MJ-346 |
| ERIC COLEMAN (01) | |

## CRIMINAL COMPLAINT

I, the undersigned Complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

Beginning in or around April 2014, and continuing until the date of this complaint, in the Fort Worth Division of the Northern District of Texas, and elsewhere, defendant **ERIC COLEMAN** did knowingly and intentionally attempt to possess with intent to distribute a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, 841 (b)(1)(C).

1. Complainant is a Special Agent of the Federal Bureau of Investigation. I have been so employed for approximately twenty-nine (29) years and am currently assigned to the Dallas Field Division's Fort Worth Resident Agency on a Criminal Enterprise Squad working with a Violent Crime/Gang Task Force (hereinafter referred to as the Task Force). The Task Force is comprised of agents, investigators and police officers from the FBI, the Texas Department of Public Safety (DPS), the Arlington, Texas Police Department (APD), and the Fort Worth, Texas Police Department (FWPD).

2. The statements contained in this Complaint are based, in part, on consensually recorded meetings and phone calls, my personal observations and on information provided by other Special Agents of the FBI and DPS and APD and FWPD officers and other law enforcement agencies identified below. Statements herein are also based on information provided by a cooperating source, who is believed by me to be reliable and credible, as set out herein, physical surveillance, police reports, and on my experience and training.

3. During the course of a short-term investigation into narcotics trafficking, **ERIC COLEMAN** has been identified an individual who was attempting to obtain controlled substances, including cocaine and crystallized methamphetamine or Ice, which he intended to sell for profit. A review of FBI reports, debriefings of a cooperating source, visual surveillance of the targets and the recorded calls and meetings from consensually recorded interceptions and the post-arrest interview of **COLEMAN**, have identified **Eric COLEMAN** as the individual seeking to possess cocaine.

4. Beginning in May 2012, the Complainant and other agents of the FBI began utilizing a Confidential Human Source (CHS 1), who was associating with a number of well connected drug dealers. CHS 1's information was utilized to initiate investigations targeting a number of Dallas area drug distributors. During these cases, CHS 1 provided accurate and reliable information regarding the targets of these investigations. CHS 1 consensually recorded a large number of telephone calls and meetings.

**Criminal Complaint – Page 2**

The recordings verified that the information CHS 1 was providing about the illegal activities of the targets of the investigations was true and correct. These cases culminated with the targets being convicted for their illegal drug distribution activities. Some of the information provided by CHS 1 related to **ERIC COLEMAN** has been verified through recorded conversations and searches of databases. Based on my interaction with CHS 1, the Complainant believes CHS 1 to be truthful and the information received from CHS 1 to be reliable and credible.

5. Because CHS 1's cooperation became known through the prosecution of the targets of the earlier investigations, the FBI stopped utilizing CHS 1 in an effort to protect CHS 1 from retaliation. However, the FBI investigators would periodically communicate with CHS 1.

6. On April 24, 2014, CHS 1 met with the Complainant and Special Agent Tim Smylie. CHS 1 reported that he/she has been in telephonic contact with a black male, **ERIC COLEMAN**, who had met CHS 1's brother in jail. **COLEMAN** was initially seeking a supply of cocaine from CHS 1. CHS 1 believed that **COLEMAN** had been previously convicted of offenses related to cocaine. The investigators asked CHS 1 to gather further information about **COLEMAN**.

7. On May 30, 2014, CHS 1 asked whether SA Farrell was prepared for the CHS to meet **COLEMAN** the following day. The CHS stated that **COLEMAN** wanted to meet at noon. **COLEMAN** told the CHS that he wanted to buy one kilogram of cocaine on Saturday, May 31, 2014.

**Criminal Complaint – Page 3**

CHS 1 told **COLEMAN** that his/her supplier only wanted to have the CHS meet **COLEMAN** to discuss further deals. **COLEMAN** stated that he hoped that CHS 1 would be able to supply one kilogram the next day. Later that same day, CHS 1 reported that **COLEMAN** called and wanted to meet that day and make the purchase of one kilogram of cocaine the following day. CHS 1 told **COLEMAN** that they would meet the next day and then complete the deal the following weekend. CHS 1 reported that **COLEMAN** agreed. Based on the investigators instructions, CHS 1 arranged to meet **COLEMAN** on Saturday, May 31, 2014.

8. Based on the information CHS 1 provided about **COLEMAN,** the investigators were able to identify Eric Coleman, Date of Birth December 17, 1973. The investigators verified that Coleman had a criminal history which included a 2004 conviction for Possession with Intent to Distribute Cocaine.

9. On Saturday, May 31, 2014, CHS 1 met with **COLEMAN** the McDonalds Restaurant, 1521 North Cockrell Hill Road, Dallas, Texas. **COLEMAN** arrived in a white Dodge Charger, Texas license DHV7645, registered to Isaac Thomas, XXXX Bayline Drive, Fort Worth, Texas. Under surveillance of investigators, CHS 1 and **COLEMAN** met at restaurant for approximately forty-five (45) minutes. The investigators also noted that another Black male remained in the Charger while **COLEMAN** was talking with CHS 1.

10. After the meeting, CHS 1 met with the Complainant and others to report what had been discussed during the meeting with **COLEMAN**.

**COLEMAN** told CHS 1 that he had brought $23,000 with him in anticipation of purchasing one kilogram of cocaine. **COLEMAN** advised that the money was in the car with his cousin. CHS 1 advised **COLEMAN** once again that there would be no exchange of money or cocaine at that time, but that it could be done the next weekend. **COLEMAN** stated that he would not be able to do it next weekend, but could do it the weekend of June 14, 2014. **COLEMAN** also stated that if the purchase was put off until June 14, 2014, that the deal would be for five kilograms of cocaine for a total of $115,000. **COLEMAN** stated that he wanted one kilogram and that a friend of his wanted the other four kilograms. The friend would travel to the Dallas-Fort Worth area with **COLEMAN** for the deal, but **COLEMAN** stated that the CHS did not have to meet him. During the course of the meeting, **COLEMAN** also advised that he had owned three semi-tractors and trailers. **COLEMAN** used these trucks to haul large quantities of marijuana from the U.S. - Mexico border at McAllen, Texas to Monroe, Louisiana. During the course of transporting these large loads of marijuana, **COLEMAN** was arrested for violating his parole. **COLEMAN** was sentenced to Beaumont Federal Prison for eighteen months. Upon completing his sentence, **COLEMAN** sold one of his semi-tractors and trailer to acquire the funding to get back in to the drug business. **COLEMAN**'s intention is to deal solely with cocaine now. CHS 1 also viewed a Texas driver's license photograph of **COLEMAN** and verified that **COLEMAN** was the individual with whom he/she had met. Surveilling investigators also verified that **COLEMAN** was the individual with which CHS 1 had met.

Criminal Complaint – Page 5

11. On June 9, 2014, CHS 1 talked with **COLEMAN** by cell phone. **COLEMAN** told CHS 1 that he would be in the Dallas area later in the week to finalize plans for the purchase of the five (5) kilograms of cocaine.

12. At the direction of the investigators, CHS 1 told **COLEMAN** that CHS 1's Source of Supply only wanted to sell larger quantities of drugs in less frequent transactions.

13. On July 29, 2014, CHS 1 reported that **COLEMAN** had continued to call the CHS seeking drugs. CHS 1 reported that **COLEMAN** and **COLEMAN'S** unidentified associates wanted three (3) pounds of methamphetamine/Ice and two (2) kilograms of cocaine by Tuesday, August 5, 2014. **COLEMAN** told the CHS that they had the money for the drugs.

14. On July 30, 2014, CHS 1 reported that he/she had talked to **COLEMAN** the previous evening. **COLEMAN** again told the CHS that that he and his associates wanted kilogram quantities of methamphetamine and cocaine the following Tuesday, August 5, 2014. **COLEMAN** stated that he wanted to buy two (2) kilograms of methamphetamine for $14,000 per kilogram and his associate wanted to buy two (2) kilograms of cocaine for $23,000 per kilogram. Using the code that he had bought a car which broke down, **COLEMAN** told CHS 1 that he had purchased some cocaine, but that it was not pure and he was not able to cook the cocaine into crack. **COLEMAN** told CHS 1 that he had transportation to move the drugs. **COLEMAN** told the CHS that he had purchased a large four door truck, possibly a Ford F-250 or F-350.

**Criminal Complaint – Page 6**

CHS 1 believed that **COLEMAN'S** federal probation had been previously violated when he was caught transporting marijuana in trucks that he owned. **COLEMAN** had supposedly sold the trucks that he had used to move the marijuana. **COLEMAN** told CHS 1 that he was no longer working at a legitimate jobs and he was only selling drugs.

15. On August 1, 2014, **COLEMAN** continued to tell CHS 1 that he was ready to purchase two (2) kilograms of crystallized methamphetamine and two (2) kilograms of cocaine the following week. **COLEMAN** offered to trade a restored 1960's Ford Mustang and a restored pickup truck for additional drugs. **COLEMAN** told the CHS that he had clear title and certificates of authenticity for both the Mustang and truck. CHS 1 asked **COLEMAN** to send him/her photographs of both vehicles.

16. On August 1, 2014, CHS 1 received text messages containing two photographs of **COLEMAN'S** truck from **COLEMAN**.

17. On August 3, 2014, CHS 1 reported that **COLEMAN** said that he has enough money for three kilograms of methamphetamine. **COLEMAN** planned to bring a 1967 Mustang and a custom truck that he had to the deal. **COLEMAN** hoped that the CHS would take the two vehicles as collateral for drugs and hold the vehicles until **COLEMAN** returned in a few weeks with payment. **COLEMAN** said that the two vehicles were in his father's name and **COLEMAN** did not want to sell or trade the vehicles for drugs.

18. On August 4, 2014, CHS 1 received text messages containing three photographs of **COLEMAN'S** 1967 Mustang from **COLEMAN**.

Criminal Complaint – Page 7

19. On August 4, 2014, CHS 1 reported that Eric **COLEMAN** wanted to buy two kilograms of cocaine and no methamphetamine. **COLEMAN** wanted to pay $23,000 cash for one kilogram and provide his 1967 Mustang as collateral for the second kilogram. **COLEMAN** told the CHS that his associates would not be making a purchase of drugs at this time. When CHS 1 asked **COLEMAN** why he would not be purchasing methamphetamine, **COLEMAN** told the CHS that he would tell him/her when they met in person.

20. On August 5, 2014, CHS 1 reported that **COLEMAN** had the 1967 Mustang in the Dallas area and he would meet with CHS 1 the following day to complete the purchase of two (2) kilograms of cocaine.

21. On August 6, 2014, **COLEMAN** and CHS 1 exchanged a number of phone calls to coordinate a meeting place to complete the sale of two (2) kilograms of cocaine. CHS 1 directed **COLEMAN**, who had told CHS 1 that he was coming from Dallas, to proceed to the intersection of State Highway (SH) 360 and Post and Paddock, Grand Prairie, Texas.

22. Investigators observed as a grey GMC extended cab pick-up truck, towing a flat bed trailer bearing a yellow Mustang which matched the Mustang in the photograph **COLEMAN** had texted to CHS 1, initially passed the Post and Paddock exit and continued north on SH 360. The GMC pick-up truck was later observed exiting SH 360 southbound at the Post and paddock exit.

The GMC truck initially proceeded east on Post and Paddock, away from CHS 1, who was positioned to lead **COLEMAN** to the meeting location. Again later, the GMC truck proceeded west on Post and Paddock. A Black male passenger, later identified as Henry Larenta McGraw, exited the truck, and began walking to a nearby restaurant. **COLEMAN** was arrested by FBI agents when he followed CHS 1 to the meeting location.

23. **COLEMAN** was later interviewed by the Complainant and SA Smylie. **COLEMAN** waived his rights, signed an Advice of Rights form and provided a statement. During the interview, which was recorded, **COLEMAN** admitted that he had been in contact with CHS 1 and was attempting to purchase cocaine from CHS 1. **COLEMAN** stated that today he intended to meet CHS 1 in an attempt to obtain two (2) kilograms of cocaine. **COLEMAN** stated that he only had a portion of the $23,000 cash for one kilogram. **COLEMAN** intended to leave the 1967 Mustang with CHS 1 as collateral for a second kilogram.

24.     Based on the foregoing, the Complainant believes that probable cause exists that **ERIC COLEMAN** has committed offenses involving violations of Title 21, United States Code, 841 (b)(1)(C), (Attempted Possession of a Controlled Substance with the Intent to Distribute).

_____
Andrew D. Farrell
Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence, 7th day of August 2014, at 2:55 a.m./p.m. at Fort Worth, Texas.

_____
JEFFREY L. CURETON
United States Magistrate Judge

Criminal Complaint – Page 10